1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

RUDY SHERMON JACKSON, JR.,

       Plaintiff,

  v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

       Defendant.

_____/

Case No. 1:21-cv-01731-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.     INTRODUCTION

Plaintiff Rudy Shermon Jackson, Jr. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.     BACKGROUND

Plaintiff was born on December 21, 1977, has at least a high school education, and previously worked as a solar energy system installer helper and a salvage laborer. (Administrative Record ("AR") 31–32, 43–48, 62–64, 68, 84–85, 100, 202.) Plaintiff protectively filed an application for SSI payments on December 10, 2018, alleging he became disabled on July 1, 2017, due to

---

[1] The parties have consented to the jurisdiction of the U.S. Magistrate Judge.  (*See* Doc. 10.)

schizophrenia, high blood pressure, and right-hand injury.  (AR 21, 68–69, 72, 86, 89, 101, 111, 202.)  Plaintiff was 40 years old on the date the application was filed.  (AR 32, 68, 85.)

**A.      Relevant Evidence of Record[2]**

   **1.      Medical Evidence**

   In July 2017, Plaintiff visited an urgent care complaining of swelling and pain in his right wrist.  (AR 538.)  Plaintiff reported that the pain shot up to his upper arm, but he denied any weakness in his wrist.  (AR 538.)  An examination revealed normal flexion and extension, as well as normal strength and tone.  (AR 538.)  Plaintiff was advised to wear a wrist splint and apply ice packs to his wrist.  (AR 538.)

   In August 2017, Plaintiff visited urgent care again complaining of wrist pain.  (AR 537.)  Plaintiff reported that pain continued to shoot up to his upper arm and he wore the wrist splint without improvement.  (AR 537.)  An examination revealed pain with increased supination, but normal flexion and extension, and Plaintiff's hand grip was at a five out of five.  (AR 537.)  Plaintiff was referred to physical therapy.  (AR 537.)  He attended physical therapy from September 2017 to December 2017 and continuously reported improvement.  (*See* AR 567–614.)

   On October 12, 2017, Plaintiff received an x-ray of his right wrist after complaining of pain.  (AR 435.)  The x-ray revealed mild degenerative changes of the wrist, bony ossification, and joint spaces, and the soft tissues were remarkable for mild eburnation of the distal radial articular surface.  (AR 435.)  There was minimal spurring seen at the distal radial ulnar joint, no evident fracture lines or dislocations, no soft tissue masses or foreign bodies, and there was a negative ulnar variance of approximately two to three millimeters.  (AR 435.)  By November 2017, Plaintiff reported feeling better with continued progress in his wrist due to physical therapy, and he indicated his pain levels had gone down and there were no new symptoms.  (AR 607, 609, 611.)

   At a physical therapy visit on December 5, 2017, Plaintiff reported that his wrist gets stiff "every now and then," but he is able to do more with his hand because of physical therapy.  (AR 613.)  Plaintiff also reported a 70% improvement as to his wrist since beginning physical therapy.

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

(AR 613.)

An MRI of Plaintiff's wrist was conducted on December 13, 2017, due to his continued complaints of pain. (AR 436–37.) The MRI indicated negative ulnar variance with distal radioulnar joint degenerative changes and joint effusion. (AR 437.) Mild dorsal subluxation of the ulna with intermediate or amorphous signal along the dorsal radioulnar ligament was also noted. (AR 437.) The MRI also indicated degenerative or cystic changes of the third metacarpal base, as well as volar bowing of the carpal tunnel contents with flexor pollicis longus tendon sheath fluid and borderline prominent median nerve with trace increased signal. (AR 437.) However, the intercarpal ligaments appeared intact. (AR 437.)

On March 26, 2018, Plaintiff visited orthopedic surgeon Sanagaram Shantharam, M.D., for an initial consultation, complaining of pain in his right wrist. (AR 292–93.) Plaintiff described the pain as popping, aching, dull, stabbing, and moderate, and he indicated there was some weakness, numbness, and tingling with his hand. (AR 292–93.) Dr. Shantharam noted that Plaintiff takes ibuprofen, he had a course of physical therapy, and he has been using a brace, which gives him some comfort. (AR 293.) An examination of Plaintiff's right wrist revealed good sensation, and Plaintiff was negative for carpal tunnel. (AR 293.) An x-ray did not show any fractures or dislocation, but an MRI indicated degenerative cystic change, third metacarpal base, and volar bowing of the carpal tunnel. (AR 293.) Dr. Shantharam explained all the MRI findings to Plaintiff and that these findings did not require surgical intervention. (AR 293.) Dr. Shantharam showed Plaintiff some exercises he could do at home and indicated Plaintiff could disregard the brace and return to activities as tolerated. (AR 293.)

On December 21, 2018, Plaintiff visited urgent care again and requested a referral for a hand specialist. (AR 310.) He complained of pain in his right wrist, acknowledged that he was seen by an orthopedic surgeon in March of that year, but he stated he was "not sure as to the outcome of his review." (AR 310.) Plaintiff reported that his pain was at a four out of ten, it was constant, and it felt worse with movement and activity. (AR 310.) An examination indicated mild swelling in Plaintiff's right wrist at his bilateral joints. (AR 310.) Plaintiff was given Dr. Shantharam's contact number and told to report any changes in his pain. (AR 310.)

1       As for his mental health, Plaintiff began experiencing psychotic symptoms at a young age.

2  (AR 409.)  He started taking medication at the age of 25, and though the symptoms increased at

3  night, Plaintiff reported improvement with medication.  (AR 409.)  In January 2019, Plaintiff visited

4  the Community Mental Health Center complaining of depressive and anxious symptoms three to

5  four times a week, paranoid and suspicious thoughts, sadness, and loneliness.  (AR 335.)  The

6  treatment note indicated a diagnosis of unspecified schizophrenia.  (AR 336.)  Plaintiff

7  acknowledged medication helped and that there was a decrease in mood fluctuation, as well as no

8  verbal or physical outbursts.  (AR 335.)  Because Plaintiff experienced improvement with

9  medication, he was deemed stable and directed to continue with his current regimen.  (AR 335–36.)

10       Plaintiff presented at the clinic again in September 2019 for medication management and

11  assessment of psychiatric treatment.  (AR 408.)  Plaintiff indicated he began taking Citalopram for

12  anxious thoughts and depressive symptoms.  (AR 408.)  Plaintiff reported that his depressive

13  symptoms had improved, his psychosis was in partial remission, and he was experiencing auditory

14  hallucinations only two to four times a month.  (AR 408.)  At another visit in September 2020,

15  Plaintiff reported delusions and hallucinations.  (AR 392.)  The treating provider, however, noted

16  that Plaintiff's symptoms were consistent with his diagnosis for schizophrenia and that his symptoms

17  improved with Citalopram and he was "now doing well."  (AR 393.)

18       **2.**    **Opinion Evidence**

19       On July 13, 2020, Dr. D. Thigpen, Psy.D., conducted a consultive mental health evaluation

20  of Plaintiff.  (AR 351–58.)  Plaintiff's chief complaints were that he felt depressed and often isolated

21  himself.  (AR 351.)  He reported the ability to function independently and take care of himself on a

22  daily basis, including bathing himself, eating, cooking, doing household chores, and watching

23  television.  (AR 352.)

24       Dr. Thigpen opined that Plaintiff's concentration, persistence, and pace, as well as his ability

25  to perform simple and repetitive tasks, appeared unimpaired.  (AR 352–54.)  Dr. Thigpen determined

26  that Plaintiff's report of symptoms, along with his presentation and Dr. Thigpen's clinical

27  observations, best fit a diagnosis of moderate and recurrent major depressive disorder.  (AR 354.)

28  Given Plaintiff's tendency and preference to isolate, Dr. Thigpen opined that his ability to accept

instructions from supervisors appeared moderately impaired, and that his ability to interact with coworkers and the public appeared severely impaired.  (AR 354.)

### 3.    Plaintiff's Adult Function Report

On February 6, 2019, Plaintiff completed an adult function report describing how his impairments limited his activities.  (AR 237–44.)  Plaintiff stated he cannot stay focused, he experienced anxiety, and he isolated himself when around others.  (AR 237.)  He reported that he does the same routine every day, which is just staying in his room, and he takes care of his daughter when she comes to visit. (AR 238.)  Plaintiff indicated he used to be able to remember things better and more clearly, and his impairments interfered with his sleep.  (AR 238.)

Plaintiff reported that he wears the same clothes for three to four days and bathes every few days.  (AR 238–39.)  Plaintiff, however, is able to feed himself on a daily basis and does not need reminders for personal needs, grooming, or taking medicine.  (AR 239.)  According to Plaintiff, he is able to do household chores like cleaning his room and mowing the lawn.  (AR 239.)  Plaintiff does not go outside often, but when he does, he is able to walk and drive.  (AR 240.)  Plaintiff is able to go grocery shopping, which does not take him long, and manage his finances.  (AR 240.)  His daughter comes over and he goes to church once a week.  (AR 241.)

Plaintiff indicated he has problems getting along with family.  (AR 242.)  Plaintiff reported that his impairments affect his concentration, as he "space[s] out."  (AR 242.)  He is able to walk half a mile before needing to stop and rest, and he can only pay attention for ten to fifteen minutes.  (AR 242.)  Plaintiff indicated he gets confused when reading instructions, and he is able to follow spoken instructions when he stays focused.  (AR 242.)  According to Plaintiff, he does not handle stress or changes to his routine well.  (AR 243.)

### 4.    Plaintiff's Son's Statements

Plaintiff's son, Maxine Jackson, completed a third-party adult function report on February 8, 2019.  (AR 245–52.)  Plaintiff's son reported that Plaintiff isolates himself from people and his memory used to be better.  (AR 245–46.)  Plaintiff is able to feed himself, but he needs reminders to take his medication.  (AR 246–47.)  According to Plaintiff's son, Plaintiff is able to walk, go out alone, drive, go grocery shopping, and manage his finances.  (AR 248.)  Plaintiff socializes by

spending time with his daughter and going to church once a week, but he needs someone to accompany him.  (AR 249.)

Plaintiff's son reported that Plaintiff's impairments affected his memory, concentration, understanding, ability to follow instructions, and his ability to get along with others.  (AR 250.) Plaintiff can walk a couple of blocks before needing to rest, and he can resume walking after resting for ten to fifteen minutes.  (AR 250.)  Plaintiff's son indicated he can pay attention for five to seven minutes, but he has trouble finishing what he started.  (AR 250.)  According to Plaintiff's son, Plaintiff does not handle stress and changes to the routine well, and he sometimes displays unusual behaviors when he is depressed.  (AR 251.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on February 25, 2019, and again on reconsideration on June 26, 2019.  (AR 21, 82–84, 98–101, 108, 111.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 117.)  The ALJ conducted a hearing on March 11, 2021.  (AR 21, 38, 40.)  Plaintiff appeared at the hearing with his attorney representative and testified as to his alleged disabling conditions and work history.  (AR 43–61.)  A Vocational Expert ("VE") also testified at the hearing.  (AR 62–66.)

**1.      Plaintiff's Testimony**

At the hearing on March 11, 2021, Plaintiff testified that he injured his right wrist while working and it continues to give him problems.  (AR 47–49.)  He stated he did not have surgery on his wrist and that physical therapy did not help, and instead made his wrist worse.  (AR 49.)  At some point, a chiropractor gave him electrical shocks in his hand, which did not lead to any improvement.  (AR 49.)  Plaintiff currently uses a wrist brace.  (AR 49, 51.)  He cannot lift and carry much because his right wrist starts aching, but he does not have problems with his grip.  (AR 53–54.)

Regarding his mental health, Plaintiff explained that he was diagnosed with schizophrenia because he heard voices, and he continues to hear a woman shouting.  (AR 54.)  He also periodically sees shadows.  (AR 54.)  Plaintiff testified that he takes medication for schizophrenia and depression.  (AR 50.)  According to Plaintiff, he does not have any problems taking care of his personal needs,

such as bathing, dressing, putting on socks and shoes, and shaving.  (AR 53.)  Plaintiff's memory is "okay" and he does not have any issues with anger outbursts.  (AR 54.)  The last time Plaintiff was hospitalized for schizophrenia was around 2006 or 2007 due to paranoid thoughts.  (AR 55.)  Plaintiff testified that medication helps control the paranoid thoughts and hallucinations, and he sees a counselor every two months.  (AR 55–56.)

Plaintiff stated he has problems with depression, with symptoms consisting of isolating himself and avoiding being around people.  (AR 56.)  He feels anxiety when there are arguments in his household, but he usually stays out of the confrontations.  (AR 56–57.)  At his prior job, he would have short conversations with his coworkers and got along with his supervisor, but he did not socialize much at work.  (AR 57.)  Plaintiff does not have problems with sleep due to his medication regimen.  (AR 57–58.)

Plaintiff usually spends his day feeding his dog, washing the dishes, cooking, and reading books.  (AR 58.)  He testified that he hears voices or sees shadows every evening, but his medication helps by making the voices less "aggressive."  (AR 58.)  Plaintiff is able to help with the housework by cutting the grass sometimes, and he is able to make basic meals for himself and do his own laundry.  (AR 59.)  According to Plaintiff, if he overexerts himself, his body starts shaking and he has to sit down.  (AR 59.)  Plaintiff is able to go to the grocery store on his own and make purchases. (AR 60.)  Plaintiff stated he has trouble staying on task during the day and needs to be reminded to do things like household chores.  (AR 60.)  Almost every day, the paranoia and voices are so bad that Plaintiff cannot do anything except lay down in his room.  (AR 61.)

**2.      The VE's Testimony**

At the hearing on March 11, 2021, the VE testified that Plaintiff had past work experience as a solar energy system installer helper and a salvage laborer.  (AR 63.)  The ALJ asked the VE to consider a person with a residual functional capacity (RFC)[3] containing the following restrictions:

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and

at least light work with occasional climbing, but no ladders, ropes, or scaffolds; the person must avoid concentrated temperate extremes; must avoid concentrated exposure to fumes, odors, dust, and poor ventilation; must avoid hazards including heights and moving machinery; the person is able to understand, remember, and carry out simple, routine, and repetitive instructions; the person can tolerate occasional interaction with supervisors, coworkers, and the public; the person requires low-stress jobs defined as no production rate-paced work; only occasional changes in the job setting; and only occasional decision-making and responsibilities.  (AR 64.)  The VE testified that such a person could not perform Plaintiff's prior jobs.  (AR 64.)

The ALJ then asked the VE to consider a person of Plaintiff's age, education, work experience, and RFC.  (AR 64.)  The VE testified that such a person could perform certain jobs in the national economy such as router, Dictionary of Operational Titles (DOT) code 322.587-038, with a light exertional level and specific vocational preparation (SVP)[4] of 2; marker, DOT code 209.587-034, with a light exertional level and SVP of 2; and housekeeping cleaner, DOT code 323.687-014, with a light exertional level and SVP of 2.  (AR 64–65.)

The ALJ asked the VE whether an additional limitation of frequently handling or fingering would eliminate or reduce any of jobs previously identified by the VE.  (AR 65.)  The VE testified that such a person would be capable of performing all three jobs.  (AR 65.)  The VE, however, stated that if the person was further restricted to occasional handling and fingering, that person would not be able to perform the three jobs previously listed by the VE.  (AR 65.)  The VE also testified that employers typically do not tolerate employees being off task for more than 10% of the workday or employees being absent for more than one day per month.  (AR 65.)

**C.      The ALJ's Decision**

In a decision dated April 5, 2021, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 21–33.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R.

---

'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

§ 404.1520.  (AR 23–33.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since December 10, 2018, the application date (step one).  (AR 23.)  At step two, the ALJ found Plaintiff's following impairments to be severe: schizophrenia; depression; anxiety; wrist injury; and asthma.  (AR 24.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 24–27.)

    The ALJ then assessed Plaintiff's RFC and applied the assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 416.967(b) except [Plaintiff] could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. [Plaintiff] could frequently handle and finger but must avoid concentrated exposure to temperature extremes, and must avoid concentrated exposure to fumes, odors, dust, and poor ventilation.  [Plaintiff] must avoid hazards including heights and moving machinery.  [Plaintiff] could understand, remember, and carry out simple, routine, and repetitive instructions.  [Plaintiff] could tolerate occasional interaction with supervisors, co-workers, and the public.  [Plaintiff] requires low stress jobs defined as no production rate paced work, only occasional changes in job setting, and only occasional decisionmaking responsibilities.

(AR 27.)[5]  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (AR 28.)

    The ALJ determined that Plaintiff was unable to perform any past relevant work (step four), but considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform a significant number of jobs in the national economy, specifically router, marker, housekeeping cleaner (step five).  (AR 31–33.)  The ALJ concluded Plaintiff was not disabled since December 10,

---

[5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  20 C.F.R. §§ 404.1567(b), 416.967(b).  Although the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  *Id.*

2018, the application date.  (AR 33.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 30, 2021.  (AR 5–10.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

## III.   LEGAL STANDARD

### A.   Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that he is not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*,

180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.   Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

*Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff contends the ALJ harmfully erred in three ways.  First, the ALJ erred by failing to provide specific, clear, and convincing reasons to reject Plaintiff's statements as to his impairments. (Doc. 14 at 19–25.)  Second, the ALJ erred in their evaluation of Plaintiff's RFC.  (*Id.* at 25–27.) Third, the ALJ erred by silently disregarding lay testimony regarding the severity of Plaintiff's impairments and their impact on his ability to work.  (*Id.* at 27–30.)  For the reasons explained below, the Court finds that the ALJ did not err.

### A.    The ALJ Properly Found Plaintiff Less Than Fully Credible

#### 1.    Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective complaints, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Id.* The claimant is not required to show that their impairment "could reasonably be expected to cause the severity of the symptom [they have] alleged; [they] need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and convincing reasons" for the rejection.[6]  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility,
> including (1) ordinary techniques of credibility evaluation, such as the claimant's

---

[6] The Court rejects the Acting Commissioner's contention that a lesser legal standard applies.  (*See* Doc. 15 at 5 n.3.)

reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "the most demanding required in Social Security cases."  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General findings are not enough to satisfy this standard; the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

**2.     Analysis**

As noted above, in determining Plaintiff's RFC, the ALJ concluded that Plaintiff's medically determinable impairments reasonably could be expected to cause the alleged symptoms.  (AR 28.)  The ALJ, however, also found that Plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were "not entirely consistent" with the RFC.  (AR 28.)  Because the ALJ did not make any specific finding of malingering, the ALJ was required to provide clear and convincing reasons supported by substantial evidence for discounting Plaintiff's subjective symptom allegations.  *Tommasetti*, 533 F.3d at 1039–40; *Smolen v. Chater*, 80 F.3d 1273, 1283–84 (9th Cir. 1996).

With respect to Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms," the ALJ found they are inconsistent "because the objective evidence did not support the severity alleged in [Plaintiff's] activities of daily living, symptomatology, and treatment regimen as set forth in his function reports, testimony, and throughout the medical record."  (AR 29.)  Specifically, the ALJ cited Plaintiff's "activities of daily living" as inconsistent "with his

allegations of debilitating impairments."  (AR 29.)  The opinion notes that despite his allegations, Plaintiff reported he is able to prepare simple meals on a daily basis, complete chores such as cleaning his room and mowing the lawn, get around by walking or driving a motor vehicle, leave the home independently, and complete errands such as shopping.  (AR 29 (citing AR 237–40, 242).) The opinion further provides that Plaintiff reported no difficulty handling finances, he is able to attend church, he can walk at least half a mile before needing to rest, and he had difficulty handling stress and changes in routine.  (AR 29 (citing AR 240–43).)  While "the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from [their] credibility as to [their] overall disability," *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)) (alteration in original), a claimant's testimony may be discredited "when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting."  *Molina*, 674 F.3d at 1113 (citations omitted); *see also Orn*, 495 F.3d at 639 (citing *Burch*, 400 F.3d at 681; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  Even in cases where daily activities "suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina*, 674 F.3d at 1113 (citations omitted).

The ALJ also referenced Plaintiff's symptomatology and treatment regimen, which "support[ed] his allegations to a degree, but are not consistent with his allegations of debilitating impairments."  (AR 29.)  The opinion notes that evidence showed symptoms arising from Plaintiff's wrist injury, including pain and swelling, improved with treatment such as ibuprofen, physical therapy, and wearing a brace.  (AR 29 (citing AR 292–94, 296, 310–11, 435–37, 537–38, 567–614).) The record also shows that Plaintiff attended physical therapy from September 2017 to December 2017 and continuously reported improvement.  (*See* AR 567–614.)  By November 2017, Plaintiff reported feeling better with continued progress in his wrist due to physical therapy, and he indicated his pain levels had gone down and there were no new symptoms.  (AR 607, 609, 611.)  By December 2017, Plaintiff indicated a 70% improvement as to his wrist since beginning physical therapy and that he was able to do more with his hand.  (AR 613.)  Similarly, the ALJ's opinion notes that Plaintiff's mental health impairments, including sadness, racing thoughts, and hallucinations,

improved with counseling and medications such as Citalopram.  (AR 29 (citing AR 335–36, 392–93, 408).)  Indeed, the record shows that Plaintiff's mental symptoms improved with medication.  (*See* AR 335–336, 393, 408–409.)

Thus, the ALJ found that the medical evidence showed Plaintiff's physical and mental health symptoms were able to be managed conservatively with treatment.  (AR 29.)  "Impairments that can be controlled effectively with medication are not disabling[.]"  *Warre v. Comm'r of the Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations omitted); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ's adverse credibility determination properly accounted for physician's report of improvement with medication); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming denial of benefits and noting that claimant's impairments were responsive to treatment).

The ALJ further noted that Plaintiff had not required surgery or inpatient hospitalizations during the adjudicative timeframe.  (AR 29–30 (citing AR 292–94, 296, 310–11, 335–36, 392–93, 408, 435–37, 537–38, 567–614).)  While "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of [the impairment]," "lack of medical evidence . . . is a factor that the ALJ can consider in [their] credibility analysis."  *Burch*, 400 F.3d at 680–81; *see also Salas v. Colvin*, No. 1:13–cv–00429–BAM, 2014 WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014) ("Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints . . . it is one factor which may be considered with others.") (citations omitted).

Plaintiff treats each of the ALJ's justifications as independent deficiencies that do not constitute clear and convincing reasons for discounting his statements regarding the severity of his impairments.  (*See* Doc. 14 at 21–24.)  But the ALJ found the foregoing ***collective*** medical evidence concerning Plaintiff's physical and mental impairments to be inconsistent with Plaintiff's statements regarding the intensity, persistence, and limiting effect of his symptoms.  (AR 29–30.)

This case stands in contrast to *Brown-Hunter v. Colvin*, 806 F.3d 487 (9th Cir. 2015), for example.  In *Brown-Hunter*, the Ninth Circuit held that it is erroneous to make a "single general statement that the claimant's statements concerning the intensity, persistence and limiting effects of

these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment, without identifying 'sufficiently specific reasons' for rejecting the testimony, supported by evidence in the case record." *Id*. at 493 (internal quotation marks and citation omitted). There, the ALJ "simply stated her non-credibility conclusion and then summarized the medical evidence supporting her RFC determination," which "is not the sort of explanation or the kind of 'specific reasons' [courts] must have in order to review the ALJ's decision meaningfully" to "ensure that the claimant's testimony was not arbitrarily discredited." *Id*. at 494.

Unlike the ALJ in *Brown-Hunter*, who did not identify the testimony they found non-credible, *see id*., the ALJ in this case summarized Plaintiff's statements regarding the intensity, persistence, and limiting effects of his impairments (AR 29–30). They then detailed the evidence—including Plaintiff's activities of daily living and treatment regimen—that contradicted Plaintiff's statements, as outlined above (*see id*.). *See also Guthrie v. Kijakazi*, No. 21-36023, 2022 WL 15761380, at *1 (9th Cir. Oct. 28, 2022) (rejecting the plaintiff's argument that "the ALJ legally erred by failing to clearly identify which portions of his symptom testimony she rejected and failing to link her rejection of that testimony to the record evidence," where the ALJ "sufficiently explained her reasons for discounting [the plaintiff's] symptom testimony, and we can easily follow her reasoning and meaningfully review those reasons.") (citing *Kaufman v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022) (stating that the court considers "the ALJ's full explanation" and the "entire record")).

In short, Plaintiff takes issue with the ALJ's characterization of the record and accuses them of presenting a selective view of the evidence in this case. (*See* Doc. 14 at 22.) But "in interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence." *Howard ex rel. Wolff v. Barnhart,* 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotation marks and citations omitted). Plaintiff references certain portions of the record and offers his competing interpretation to establish error. (Doc. 14 at 21–24.) However, the ALJ, not the Court, is responsible for weighing evidence and resolving conflicts. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Where, as here, the ALJ did so and the record supports their conclusions, the conclusions should be upheld. *See Hiler v. Astrue*, 687 F.3d 1208, 1211 (9th Cir. 2012). This is so even if Plaintiff's interpretation of the evidence is rational. *See Ford*, 950 F.3d at 1154; *Orn*, 495 F.3d at

630. The ALJ's discussion sufficiently demonstrates that they did not arbitrarily reject his statements. *See Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996).

For these reasons, the ALJ articulated specific findings to support the conclusion that Plaintiff's statements regarding his impairments were not entirely consistent with the evidence in the record.  Because substantial evidence in the record supports the ALJ's credibility finding, the Court "may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

**B.      The ALJ Did Not Harmfully Err in Formulating Plaintiff's RFC**

**1.      Legal Standard**

An RFC "is the most [one] can still do despite [their] limitations" and it is "based on all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of evidence. 20 C.F.R. § 404.1545(a)(1); *Vertigan*, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.").  An ALJ's RFC determination need not precisely reflect any particular medical provider's assessment.  *See Turner v. Comm'r Soc. Sec. Admin.*, 613 F.3d 1217, 1222–23 (9th Cir. 2010) (the ALJ properly incorporated physician's observations in the RFC determination while, at the same time, rejecting the implication that plaintiff was unable to "perform simple, repetitive tasks in an environment without public contact or background activity").  In making the RFC determination, the ALJ considers those limitations for which there is record support that does not depend on properly rejected evidence and subjective complaints.  *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004).  A reviewing court "will affirm the ALJ's determination of [a claimant's] RFC if the ALJ applied the proper legal standard and [their] decision is supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

**2.      Analysis**

Plaintiff notes that the ALJ's RFC determination included a finding that he "could tolerate occasional interaction with supervisors, co-workers, and the public."  (Doc. 14 at 26–27; *see* AR 27.)  Plaintiff emphasizes that Dr. Thigpen opined that during the relevant time period, Plaintiff had a severe impairment interacting with coworkers and the public.  (Doc. 14 at 26; *see also* AR 30–31,

354.)  Specifically, given Plaintiff's tendency and preference to isolate, Dr. Thigpen opined that his ability to interact with coworkers and the public appeared severely impaired, but Dr. Thigpen otherwise did not elaborate on this opinion.  (AR 354.)  As such, Plaintiff contends that the ALJ erred at step two by failing to provide an explanation for this discrepancy.  (*Id*. at 26–27.)

The ALJ considered Dr. Thigpen's opinion in the context of the longitudinal record and found it to be persuasive, which Plaintiff does not challenge.  (AR 30–31.)  The ALJ explained that Dr. Thigpen's opinion was persuasive because Dr. Thigpen is a mental health specialist and the opinion was consistent with and supported by Dr. Thigpen's examination of Plaintiff.  (AR 30.)  Specifically, the ALJ explained that Dr. Thigpen's report shows that, despite some problems with recall, fair insight, and judgment, Plaintiff's concentration, persistence, pace, and abstract thinking were unimpaired during the examination, and he did not display active hallucinations.  (AR 30–31 (citing AR 351–54).)  The ALJ, as they are charged to do, then interpreted that evidence in conjunction with other evidence in the record, such as Plaintiff's own reports that he only experiences two to four hallucinations per month and he acknowledged that his symptoms improved with treatment compliance (AR 31; *see, e.g.,* AR 55–56, 393, 408), and formulated Plaintiff's RFC. In coming to this determination, the ALJ also noted that even though Plaintiff had been diagnosed with schizophrenia, anxiety, and depression, he had not required psychiatric hospitalization during the adjudicative time frame.  (AR 31.)  Thus, the ALJ explained that Plaintiff's RFC accommodated his symptoms by limiting him to unskilled, low-stress work with limited interactions with other people.  (AR 31.)

The ALJ also considered Plaintiff's reports that he can perform activities of daily living to support the conclusion that Plaintiff is only moderately limited in his ability to interact with other people.  (AR 26.)  For example, the ALJ found that despite Plaintiff's tendency to socially isolate and his occasional hallucinations, Plaintiff reported that he is able to live in a house with his family, go out in public around groups of people, attend church, and complete errands such as shopping. (AR 26; *see, e.g.,* AR 53, 55–60, 237–42, 352.)  The ALJ was entitled to review and interpret this evidence.  *See, e.g., Ann M. v. Berryhill*, No. 5:18-cv-01080-KES, 2019 WL 1171160, at *6 (C.D. Cal. Mar. 12, 2019) ("Contrary to the cases cited by Plaintiff, the records in this case provided the

1    ALJ with ample support for his RFC, which was based not on raw data but on treatment notes, which

2    included Plaintiff's subjective complaints, observations by . . . physicians, and the treatment plans.")

3    (internal quotation marks omitted) (distinguishing *Cortez v. Colvin*, No. 1:15-cv-00102-EPG, 2016

4    WL 3541450, at *6 (E.D. Cal. June 24, 2016)); *Mills v. Comm'r of Soc. Sec.*, No. 2:13-cv-0899-

5    KJN, 2014 WL 4195012, at *4 n.8 (E.D. Cal. Aug. 22, 2014) (finding argument that the ALJ was

6    improperly attempting to "play doctor" lacked merit where the ALJ "carefully analyzed the various

7    medical opinions, treatment records, and plaintiff's own testimony in formulating an RFC."); *see*

8    *also* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the

9    relevant evidence in your case record."); *id*. § 404.1546(c) ("[T]he administrative law judge . . . is

10   responsible for assessing your residual functional capacity.").

11        Plaintiff does not specify what additional functional limitations stemming from a severely

12   impaired ability to interact with coworkers and others were not accounted for in the ALJ's RFC

13   assessment, and how such limitations would eliminate *all* jobs in the national economy that Plaintiff

14   could have performed.   *See* TITLES II & XVI: CAPABILITY TO DO OTHER WORK-THE MEDICAL-

15   VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS,

16   SSR 85-15 (S.S.A. 1985) ("Mental impairments may or may not prevent the performance of a

17   person's past jobs.  They may or may not prevent an individual from transferring work skills."); *see*

18   *also Karl v. Kijakazi*, No. 1:21-cv-01576-SKO, 2023 WL 3794334, at *7 (E.D. Cal. June 1, 2023).

19   As discussed above, the ALJ specifically explained that Plaintiff's RFC accommodated his mental

20   health symptoms by limiting him to unskilled, low-stress work with *limited* interactions with other

21   people.  (AR 31.)  To the extent Plaintiff is advocating for an alternative interpretation of the

22   evidence in the record, the Court will not second guess the ALJ's reasonable interpretation, even if

23   such evidence could give rise to inferences more favorable to Plaintiff.  *See Molina*, 674 F.3d at

24   1110.

25        In sum, the Court finds that substantial evidence supports the ALJ's conclusions regarding

26   the impact of Plaintiff's impairments on the RFC.  Plaintiff may disagree with the RFC, but the

27   Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of the

28   evidence. *See Ford*, 950 F.3d at 1159 ("Our review of an ALJ's fact-finding for substantial evidence

1  is deferential"); *Thomas*, 278 F.3d at 954.

2        **3.**      **Even Assuming *Arguendo* the ALJ Did Err, Such Error was Harmless**

3       Even had the ALJ erred by failing to conclude that Plaintiff had a severe mental impairment

4  during the relevant time period interacting with coworkers and the public, such error was, at most,

5  harmless.  A claimant is prejudiced at step two by an ALJ's omission of an impairment only where

6  that step is not resolved in the claimant's favor.  *See, e.g., Burch*, 400 F.3d at 682 ("Here, the ALJ

7  did not find that Burch's obesity was a 'severe' impairment . . . . Assuming without deciding that

8  this omission constituted legal error, it could only have prejudiced Burch in step three (listing

9  impairment determination) or step five (RFC) because the other steps, including this one, were

10  resolved in her favor."); *Hickman v. Comm'r Soc. Sec. Admin.*, 399 Fed. Appx. 300, 302 (9th Cir.

11  2010) ("Any error in the ALJ's failure to include a reading disorder as one of Hickman's severe

12  impairments at step two of the analysis is harmless.  The ALJ found Hickman suffered from other

13  severe impairments and, thus, step two was already resolved in Hickman's favor.").  Additionally,

14  the failure to include an impairment in the step two analysis is harmless if the ALJ considers the

15  functional limitations that flow from said impairment in subsequent steps.  *See Lewis v. Astrue*, 498

16  F.3d 909, 911 (9th Cir. 2007) (holding that ALJ's failure to list plaintiff's bursitis as a severe

17  impairment at step two was harmless where ALJ considered limitations caused by the condition at

18  step four).

19       At step two, the ALJ determined that Plaintiff's severe impairments included

20  schizophrenia, depression, anxiety, wrist injury, and asthma.  (AR 24.)  The ALJ then proceeded

21  to the step three analysis.  (*See* AR 24–27.)  Because Plaintiff's claims were not screened out at

22  step two, he was not prejudiced by any error in the step two analysis.  *See Wilson v. Kijakazi*, No.

23  1:20-cv-01753-SKO, 2022 WL 3908428, at *12 (E.D. Cal. Aug. 30, 2022).  The ALJ further stated

24  in RFC findings that they "considered all symptoms and the extent to which these symptoms can

25  reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ."

26  (AR 27).  *See, e.g., Sara Ann W. v. Comm'r of Soc. Sec.*, No. 2:17-CV-00277-RHW, 2018 WL

27  4088771, at *4 (E.D. Wash. Aug. 27, 2018) ("the ALJ specifically noted that she considered *all*

28  *symptoms* in assessing the [RFC] . . . Accordingly, the Court finds the ALJ did not err in the step

two analysis, and if any error did occur it was harmless.") (original italics).  And, as provided above, the ALJ's opinion specifically explained that Plaintiff's RFC accommodated his mental health symptoms by limiting him to unskilled, low-stress work with limited interactions with other people.  (AR 31.)

In sum, the Court concludes that the ALJ properly weighed the medical evidence and did not harmfully err in their assessment of Plaintiff's RFC.  *See Wilson*, 2022 WL 3908428, at *2; *Kendall v. Saul*, No. 1:19-cv-01485-SKO, 2021 WL 736268, at *13–14 (E.D. Cal. Feb. 25, 2021).

### C.    The ALJ Did Not Commit Reversible Error as to Plaintiff's Son's Lay Witness Statements

Plaintiff contends the ALJ erred by failing to articulate any rationale for rejecting lay witness statements from his son.  (Doc. 14 at 27–30.)  As both parties appear to agree (*see* Doc. 14 at 28; Doc. 15 at 11, 14), the ALJ's opinion contained no discussion of the adult function report submitted by Plaintiff's son.  The parties, however, dispute the standard applicable to this issue. Plaintiff asserts the ALJ was required to provide germane reasons to discount the lay witness statements.  (Doc. 14 at 27–30.)  The Acting Commissioner contends that, under relevant new regulations, no such articulation was required.  (Doc. 15 at 11–15.)

The Court notes the presence of case law indicating that an ALJ need not necessarily articulate the reasons to discount lay witness statements under the revised regulations.  *McNabb v. Comm'r of Soc. Sec.*, No. 1:22-cv-01055-EPG, 2023 WL 4087639, at *6 (E.D. Cal. June 20, 2023) (citing *Fryer v. Kijakazi*, No. 21-36004, 2022 WL 17958630, at *3 n.1 (9th Cir. Dec. 27, 2022) ("It is an open question whether ALJs are still required to consider lay witness evidence under the revised regulations, although it is clear they are no longer required to articulate it in their decisions."); *Neri v. Comm'r of Soc. Sec.*, No. 1:21-cv-01235-SAB, 2022 WL 16856160, at *7 (E.D. Cal. Nov. 10, 2022) (opining that, under the revised regulations, an ALJ must consider, but not necessarily articulate how, the ALJ considered lay testimony, and concluding that, in any event, the result would be the same if the germane-reasons standard applied)).

Ultimately, the Court need not resolve this dispute.  "Importantly, courts have declined to reverse on this issue where an ALJ provided clear and convincing reasons to reject a Plaintiff's

complaints, where such complaints were similar to the lay testimony." *McNabb*, 2023 WL 4087639, at *6 (citing *Valentine*, 574 F.3d at 694 ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting [the plaintiff's] own subjective complaints, and because [his wife's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony.")).

Here, the lay witness statements by submitted Plaintiff's son were similar to his own complaints about his symptoms and limitations. For example, both Plaintiff and his son reported that Plaintiff experienced problems with concentration and maintaining focus. (*See* AR 237, 242, 250.) Plaintiff and his son also reported that Plaintiff isolated himself from others, his memory used to be better, and he does not handle stress and changes to his routine well. (AR 56, 237–38, 243, 245–46, 250–51.) Both Plaintiff and his son, however, reported that Plaintiff is able to feed himself on a daily basis, he is able to walk and drive, he can manage his finances, he can complete errands like grocery shopping, and he is able to go to church once a week. (*See* AR 59–60, 239–41, 246–49.)

As discussed above, the ALJ provided sufficient reasons to reject Plaintiff's complaints. Accordingly, the ALJ's opinion likewise was sufficient to discount the lay witness statements from Plaintiff's son. *See McNabb*, 2023 WL 4087639, at *6.

**V.      CONCLUSION AND ORDER**

After consideration of Plaintiff's and the Acting Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **July 21, 2023**                              */s/ Sheila K. Oberto*
                                                              UNITED STATES MAGISTRATE JUDGE